IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
June 28, 2005 Session

**STATE OF TENNESSEE v. WILLIAM A. HAWKINS**

**Direct Appeal from the Criminal Court for Sullivan County**
**No. S46,562     Phyllis H. Miller, Judge**

_____

**No. E2004-01761-CCA-R3-CD - Filed November 4, 2005**

_____

The appellant, William A. Hawkins, was convicted of first degree premeditated murder, and he received a sentence of life imprisonment. On appeal, the appellant challenges the sufficiency of the evidence, the trial court's evidentiary rulings, and the jury instructions. Following our review, we affirm the judgment of the trial court but remand for entry of a corrected judgment to reflect the correct date of the judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed and Case Remanded for Entry of a Corrected Judgment**.

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR. and ROBERT W. WEDEMEYER, JJ., joined.

Stephen M. Wallace, Blountville, Tennessee, for the appellant, William A. Hawkins.

Paul G. Summers, Attorney General and Reporter; Kathy D. Aslinger, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and Barry P. Staubus and William B. Harper, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.  FACTS**
**State's Proof**

On June 26, 2002, the appellant was indicted for the first degree premeditated murder of Roy Vitattoe. At trial, William Vittatoe, the victim's father, testified that his son was thirty-nine years old at the time of his death. Vittatoe stated that on April 21, 2002, he lived on Devault Bridge Road, and the victim lived in a camper at his house. Vittatoe believed that the victim and the appellant were friends.

On Friday, April 19, 2002, between 7:00 a.m. and 8:00 a.m., the victim arrived at Vittatoe's house. At approximately 4:00 p.m., the victim left with his brother, Billy. The following morning, at approximately 7:00 a.m., the victim returned to Vittatoe's house. He had been drinking and was suffering from a hangover. The victim went to his camper to sleep. Later that day, Vittatoe woke the victim and drove him to Evelyn Arthur Neil's house. They arrived at approximately 1:00 p.m. The victim was still ill. The victim told him that Neil would take him home later, so Vittatoe left for work. Vittatoe never saw the victim alive again.

Vittatoe said the victim had the camper for about five years. Vittatoe had never seen a gun in the camper and had never known the victim to own or use a gun.

George Warren, Jr., testified that he had known the victim over twenty years and had been to his camper numerous times. Warren said he had never seen a gun at the victim's camper and had never known the victim to possess a gun.

Evelyn Arthur Neil testified that she and the victim were friends. On April 20, 2002, Neil called Vittatoe and asked him to bring the victim to her house to top some trees in her front yard. At approximately lunch time, Vittatoe brought the victim to Neil's house. Neil said that the victim was sick when he arrived because he had been drinking the previous night. The victim tried to help Neil with the tree work but was unable to do so because of his condition. Neil took the victim back to his father's house later that day at around 9:00 p.m. or 9:20 p.m. Neil maintained that she did not know anyone named Ella Thacker. She denied that Thacker came by her house on April 20, 2002, while the victim was there.

Chasity Lee Gentry testified that she and her husband, Mark Gentry, were friends with the appellant. Mrs. Gentry said on Saturday, April 20, 2002, she picked up the appellant at his house so he could help Mr. Gentry fix the Gentrys' trailer. The trailer was located at Mrs. Gentry's mother's house. The appellant was wearing blue jean shorts, a white shirt, and tennis shoes. When the appellant first got into the vehicle, he told Mrs. Gentry that he had taken some pills. On the way to the trailer, they stopped at a gas station, and the appellant purchased a six-pack of beer. They arrived at the residence shortly after 5:00 p.m. Mr. Gentry was already there, and the appellant helped him work on the Gentrys' trailer. While the appellant was working on the trailer, Mrs. Gentry noticed that the appellant had a cut on the lower part of his leg.

At the same time the appellant and Mr. Gentry were working on the trailer, other people were there, preparing a barbecue. The appellant ate and drank beer. The Gentrys took the appellant home at approximately 9:30 p.m. or 10:00 p.m. because he was getting loud and rowdy, and he had become intoxicated. En route, the appellant asked the Gentrys to take him to the victim's residence. Initially, the Gentrys refused, and the appellant became angry, demanding to be taken to the victim's residence. Ultimately, Mr. Gentry complied. When they passed a church on Devault Bridge Road, the appellant showed them the victim's father's house and told them to turn the van around. The appellant then got out in front of the victim's camper. The camper was very dark except for the light from a television set. The appellant instructed the Gentrys to wait at the nearby church.

After approximately five minutes, the appellant, who was shirtless and out of breath, returned to the Gentrys' van. Mrs. Gentry noticed that the appellant had blood on his face, and, when she asked him about it, he told her that he and the victim had gotten into a fight. The appellant also told her that he had left the victim for dead. He described the scene as "gruesome as hell," and he said that he was glad she and Mr. Gentry did not see it. She said the appellant was different when he returned to the van, saying he seemed very angry and kept changing topics during his conversation. The appellant told the Gentrys that the victim and his brother "had done something to April [Jackson Booher] in front of her children."

At the appellant's direction, the Gentrys drove him to a gas station in Johnson City. At the gas station, Mrs. Gentry got out of the vehicle to use the restroom. She saw the appellant throw something in a dumpster and noticed that he was no longer wearing his socks or shoes. As they were leaving the gas station, she saw that the appellant had blood on his arm and all over his shorts.

The appellant then asked the Gentrys to take him to the house of his sister, Judy Garrett. The Gentrys left the appellant at Garrett's close to midnight. After leaving the appellant, Mr. and Mrs. Gentry went to Larry Swift's house where they were living temporarily while the work was being completed on their trailer. She said the appellant knew where they lived and knew their telephone number. Neither she nor her husband had any contact with the appellant the following day, Sunday, but Mr. Gentry talked to him by telephone on Monday. Mrs. Gentry recognized the appellant's voice, but she was unable to hear what he was saying. Mrs. Gentry said that the appellant called several times that day. She knew the appellant was the caller because the Swift's telephone was equipped with a caller identification device. She recognized the incoming number as the appellant's.

The appellant called Mr. Gentry again on Tuesday, April 23, 2002. After the call, Mr. and Mrs. Gentry went to April Jackson Booher's house to pick up the appellant. Mrs. Gentry said that Booher was a friend of the appellant's, explaining that she believed that Booher was the "April" that the appellant had been talking about on Saturday night.

When the Gentrys arrived at Booher's residence, the appellant asked them to take him to Garrett's house so he could get the shorts he had left there. During the drive, the appellant told the Gentrys that he thought they had been talking to police, and he believed that "he was going to have to come after us with a gun." The appellant instructed the Gentrys that if they were questioned by the police, they should say that on the night the victim died, they picked the appellant up to work on the trailer, then they went down by the river to smoke marijuana before taking the appellant to his sister's house.

When they arrived at Garrett's, the appellant went inside to get his shorts. The appellant looked for ten to fifteen minutes, but he could not find them. At that point, the Gentrys took the appellant back to Booher's residence.

Judy Garrett, the appellant's sister, testified that on April 21, 2002, she lived in Bluff City. At approximately 1:00 a.m. on April 21, 2002, the appellant called her and asked permission to spend the night at her house. He arrived a few minutes later accompanied by the Gentrys. Shortly after the appellant's arrival, Garrett noticed that the appellant was wearing only shorts, and his face was peppered with tiny specks of blood. Garrett asked the appellant what had happened, and he responded with a blank look on his face which scared Garrett. Garrett believed that something was wrong with the appellant, possibly that he was intoxicated. Garrett left the appellant alone to shower and sleep.

Garrett found the appellant the next morning sleeping on the carpet beside Garrett's daughter's bed in which he was supposed to sleep. The room had been "wrecked." When the appellant woke, he did not recall how he had gotten to Garrett's house. Garrett noticed that the appellant had scratches on his legs near his ankle. The appellant said that he had been scratched while working on the Gentrys' trailer. The appellant asked Garrett where his shorts were. Garrett did not know, and they searched unsuccessfully for the appellant's missing shorts. The appellant left shortly thereafter. Garrett later found the appellant's shorts hidden in a closet next to the bathroom. She noticed that the shorts were stained with tiny specks of blood. She said she initially put the shorts with her dirty clothes, but "[a]fter she heard the news Monday," she put the shorts in a plastic bag and hid them in a chest in her bedroom. The appellant called Garrett several times over the next few days, inquiring about the shorts. Garrett lied to the appellant and told him that she did not have them.

On April 23, 2002, Garrett put the shorts in a duffel bag and took the bag to the house of her sister, Ruby Shores, in Bristol. While at Shores' house, Garrett called the appellant and told him that she would bring him the shorts. However, Garret and Shores put the shorts in a trunk at a neighbor's house instead.

Garrett and the appellant had several conversations that day regarding the location of the shorts. Garrett repeatedly asked the appellant why he wanted the shorts if he had not done anything wrong. The appellant eventually became angry, sarcastically telling her that he had killed the victim because he was bored.

At some point, Garrett and Shores left Shores' house and drove to Booher's residence. Upon arriving there, they learned that the appellant had been arrested. Garrett and Shores then retrieved the duffel bag containing the appellant's shorts, and Garrett placed the bag containing the shorts in Shores' vehicle. Garrett acknowledged that she took a guitar belonging to the victim's family to the sheriff's office after the appellant was arrested.

Ruby Shores, the appellant's sister, testified that on April 24, 2002, Garrett came to her house in Bristol. Garrett was panicky, and she had with her a duffel bag. Shores and Garrett put the bag in a trunk at a neighbor's house. While Garrett was talking with the appellant on the telephone, Shores and Garrett drove to Booher's house where they learned the appellant was being arrested. They then retrieved the duffle bag, placing it in Shores' vehicle before going to speak with police.

Police detectives accompanied Shores to her vehicle, which was located at her house, to confiscate the duffel bag.

Detective Bobby Russell testified that on April 24, 2002, he met with Judy Garrett and Ruby Shores. Subsequently, Detective Russell went to Shores' house where he collected from the back of Shores' vehicle a duffel bag containing a pair of denim shorts.

Sergeant Jeff Parker with the Sullivan County Sheriff's Department testified that at 9:05 a.m. on April 21, 2002, he was dispatched to 3593 Devault Bridge Road. At that location, he found the deceased victim lying on plywood outside a truck camper. A large puddle of blood surrounded the victim's head. Initially, officers believed that the injuries were possibly attributable to a gunshot wound to the head. While examining the scene, Sergeant Parker noticed that the camper's window had been broken. Officers looked inside the window but did not open the door to or go inside the camper.

Detective Reese Christian testified that at 10:00 a.m. on April 21, 2002, he arrived at the crime scene. Upon his arrival, he observed a small, white camper approximately fifteen feet long sitting on blocks. The camper was located just off Devault Bridge Road down an embankment. The camper was located between 100 and 150 feet from the victim's father's house and was about fifty feet off the roadway. Detective Christian said that the camper was approximately 700 feet from Muddy Creek Missionary Baptist Church. There was a field between the church and the highway area.

Detective Christian saw the victim's body lying about three or four feet from the camper on a piece of plywood or pressed board, and two overturned chairs were next to the body. The victim was lying on his back with his arms down by his side. Detective Christian noticed that there were massive injuries to the victim's head. There was a significant amount of blood around the head and the top of the body. Additionally, there was blood on the victim's pants and socks. The victim was missing a couple of teeth which were found on the plywood, next to his body. Detective Christian said he found blood on the back of the camper from the top to the bottom, on the ground around the victim's body, and on a small grill. He also found bloody shoe prints on the plywood. Detective Christian went inside the camper and noticed that the portable television was still on.

Detective Christian said a hewn tree limb measuring about fifty-two inches long was found in the woods about ninety-five feet from the victim's body. From the midpoint to the end of the limb, the limb was marked with blood, hair, and brain matter. Believing the victim had been shot, the investigators searched the area for a gun, but no gun was found.

Detective Christian testified that at approximately lunch time on April 22, 2002, two days prior to the appellant's arrest, he interviewed the appellant. Detective Christian noted that during the interview, the appellant was cooperative, friendly, coherent, and was not under the influence of an intoxicant. During the interview, the appellant told Detective Christian that he and the victim had been friends since childhood. He acknowledged that he and the victim had fought in the past but

said they had remained friends. The appellant told Detective Christian that in January or February 2002, he saw the victim at Booher's house. After staying and drinking for a while, the appellant went home, and, ten minutes later, one of Booher's daughters called the appellant saying that the victim was trying to "mess with" Booher. The appellant called the Bristol Police Department. Police responded to the call and arrested the victim for an outstanding child support warrant. Shortly after the victim was incarcerated, the appellant was arrested and jailed for driving under the influence (DUI). The appellant said that the last time he saw the victim was during their mutual incarceration. The appellant recalled that he was released from jail around March 29, 2002, and that the victim had been released about a month prior to the appellant's release.

The appellant told Detective Christian that the victim had a problem with alcohol, and he became obnoxious and mean when he drank. As a result, the victim made many people angry. Specifically, the appellant recalled that the victim had problems with Smitty or Dennis Smith because Smith did not like the victim coming to his girlfriend's house. The appellant said that Michael Byers had a "vendetta" against the victim "because of a fight they had before at Boosie Creek for punching Kim Neil, that is Michael Byers' girlfriend." The appellant also told Detective Christian that the Ramsey brothers were angry with the victim. The appellant concluded the interview by saying that he loved the victim like a brother, and he had no reason to harm the victim. After the conclusion of the interview, Detective Christian reduced the appellant's statement to writing, and the appellant signed it. Detective Christian said that, during the interview, he noticed that the appellant had a cut or a scratch on his right shin and a scratch or cut on the top of his right hand. The appellant explained that he injured his leg by falling out of a truck or by stepping from a truck into a mobile home.

Detective Christian interviewed the appellant again on April 24, 2002, shortly after the appellant had been arrested. He said the appellant had been drinking but did not appear to be intoxicated or under the influence of drugs. Detective Christian stated that prior to the interview, he advised the appellant of his Miranda rights. The appellant executed a waiver of his rights, and the interview proceeded.

During the April 24, 2002, interview, the appellant again told Detective Christian about an incident that occurred in February 2002 when the victim was at Booher's apartment, "messing with or bothering" her. The appellant told the victim to leave and when he refused to do so, the appellant called 911. As a result of the call, the victim was taken into custody. The victim was ultimately incarcerated because he owed back child support. The appellant and the victim were incarcerated at the same time, with the victim gaining earlier release. The appellant learned that the victim told some fellow inmates that the appellant was a "snitch," and he would get revenge on the appellant for calling the authorities on him.

The appellant told Detective Christian that after he was released from jail, Booher had informed him that once while she was on medication, the victim's brother came to her apartment and did something to her. Additionally, Booher's daughter told the appellant that she had seen the

-6-

victim's brother having sex with Booher. The appellant became upset with the victim and his brother for harassing Booher.

Continuing with the interview, the appellant told Detective Christian that on Saturday, April 20, 2002, the day of the victim's death, he had taken about twenty-five Xanax pills and consumed a case and a half of beer. The appellant maintained that he became heavily intoxicated and went to the victim's camper. He said when he knocked on the door, the victim began calling him derogatory names. The victim, armed with a gun, cursed the appellant and hit him on the right wrist. The appellant said when he saw the victim's gun, his "brain went into overdrive," and he picked up a stick to disarm the victim. The appellant vaguely recalled hitting the victim with the stick, believing that he hit the victim in the head when the victim swung the gun. The appellant claimed that he "kind of blacked out and everything happened so fast." The appellant saw the gun on the ground and picked it up. The appellant admitted that he did not check on the status of the victim before leaving. The appellant could not recall what he did with the stick.

The appellant stated that someone had taken him to the victim's residence. When he left the residence, he told them that he and the victim had gotten into a scuffle. The appellant explained that he did not want to "implicate" in the altercation the people who had driven him to the camper.

The appellant told Detective Christian that he threw the gun away while he went down the road but could not remember where he threw it. He said he went to his sister's house after the incident and did not know that the victim was dead until the victim's brother called him. The appellant told Detective Christian that he was not looking for trouble when he went to see the victim. He also told Detective Christian that the victim kept coming around with a gun, wanting to kill him. The appellant concluded the interview by saying that he was sorry, that he wished he had never gone to see the victim, and that he never trusted the victim around Booher and her children. After the interview, the appellant's statement was reduced to writing, and the appellant signed and initialed each page.

Detective Christian said that he and other investigators searched the crime scene the day after the second interview, but they never found a gun. Detective Christian went to Larry Swift's residence on April 23 where he made photographs of the caller identification box showing four calls from the appellant's cellular telephone number. Detective Christian found a walking stick inside the victim's camper which was similar to the tree limb recovered from the scene. Detective Christian noted that at the time of the murder the appellant was five feet, eleven inches or six feet tall and weighed about 250 to 260 pounds.

Charles Hardy with the Tennessee Bureau of Investigation Crime Laboratory testified that he examined the tree limb, the appellant's shorts, and two boards of plywood, all of which tested positive for blood. Further analysis revealed that the blood contained the victim's DNA. One board of plywood also contained the DNA of another person. Hardy stated that the appellant could not be excluded as the minor contributor of that profile.

Dr. Gretel Stephens, an expert in forensic pathology, testified that on April 23, 2002, she performed the autopsy on the victim's body. She determined that the victim was five feet, six and one-half inches tall and estimated his weight as 170 pounds. The victim's blood alcohol content was .01%, and his urine tested positive for marijuana. Dr. Stephens determined the cause of death to be blunt trauma to the head. The doctor noted that she had examined the tree limb recovered from the scene. According to Dr. Stephens, the victim sustained "at least sixteen blows with an irregular club consistent with that tree limb," including blows to the head, face, neck, shoulders, upper chest, back, and right wrist, with "a minimum of nine blows to the head[,] face and neck."

Dr. Stephens discovered that the victim had two fractures of the lower jaw bones, fractures of the upper jaw bone, fractures across the face, vertical fractures of the jaws, and fractures involving the cheek bones and the nasal bone. There was a fracture to the frontal skull which was "a depressed fracture that shows it's kind of a raid appearance along it where it has sunken in quickly and these additional fractures are extending out from it." The victim also had six of his teeth knocked out and had a "partial separation of the coronal suture . . . meaning that the brain or the skull's suture which is supposed to be closed in a man of his age is actually sprung and is open from the injuries." Because of the victim's depressed fracture, Dr. Stephens opined that his head had been "braced against something solid behind him like a solid wall or even more likely on the ground because then even if he loses consciousness his head is not going to move markedly and that type of blow or repeated blows could be landed in that lying down position with the head braced on the ground."

Dr. Stephens said the victim also had two injuries to his back, one of which she described as a "prod." She explained that "instead of the long part of the weapon hitting the skin there it looks as though an end of the weapon, probably the big end from the pattern of the injury, has been used to poke him hard." She said that blow was inflicted while the victim had his back turned and could have been forceful enough to knock him to the ground. She found a defensive wound on the back of the victim's right wrist. The victim also had a "two slat or two edge type abrasion, something like the edge of a door screen, aluminum door screen" and had suffered a "chopping blow" to the left shoulder which resulted in a dislocation of the acromio-clavicular joint. According to Dr. Stephens, the victim did not have any injuries consistent with a fistfight with another person. Dr. Stephens said she had only seen injuries of this magnitude "from things like motor car crashes, semi crashes and air crashes."

**Defense Proof**

Ten-year-old Diamond Booher, April Jackson Booher's daughter, testified that one night approximately two years prior to trial, the appellant and the victim came to her house. After visiting for a while, the appellant left, but the victim remained. Diamond saw the victim put some pills in her mother's drink. Diamond recalled that after her mother consumed some of the drink, she began stumbling, ultimately going into a bedroom to lay down on a bed with Diamond and her sister. The victim came into the bedroom and started "jumping" on them. The "jumping" aggravated Diamond's asthma. Diamond then called her aunt, Eve, to get the appellant's telephone number. After getting the telephone number, Diamond called the appellant and told him that the victim was

jumping on them. At the appellant's request, Diamond told him their address. Subsequently, the police came to her house and took the victim away.

Eve Mary Griffin Jackson, April Jackson Booher's sister, testified that in 2002 she lived on Volunteer Parkway near her sister and the appellant. She stated that on one evening in 2002, she had been to dinner with her parents. Upon returning home, she checked her messages and discovered that Diamond had called her repeatedly. Jackson returned Diamond's call, and, soon thereafter, she went to Booher's house. Booher was incoherent and had trouble moving. Police were also at Booher's house, and they arrested the victim.

Jackson said that she and the appellant had been friends for five years, and the appellant was also best friends with her sister. From the time the appellant was released from jail in March 2002 to the time of the victim's death, she never heard the appellant express any animosity toward the victim or threaten to hurt him. At approximately 4:00 p.m. on Saturday, April 20, 2002, Jackson visited the appellant at his trailer. The appellant had been drinking and had taken some Clonapin pills, and he was preparing to go with the Gentrys to a cookout.

The following morning at approximately 1:30 a.m. or 2:00 a.m., the appellant called Jackson. She had difficulty understanding what the appellant was saying. Jackson acknowledged that she had taken the appellant to visit the victim on prior occasions. She recalled that the victim got a pistol from her in September or October 2001, but she did not know what he had done with it. Jackson said the appellant had asked her to keep the gun at her house, but when the victim asked for it, she gave it to him "because he said he needed it."

Chad Peters with the Sullivan County Sheriff's Department testified that on February 1, 2002, he arrested the victim at 2352 Volunteer Parkway on a child support warrant. He did not believe that the victim was intoxicated at the time of his arrest.

Ella Kate Thacker testified that she knew the appellant and the victim. In April 2002, Thacker saw the victim at "Evelyn's house." During a conversation, the victim told Thacker that the appellant had "snitched" on him, and he no longer wanted to be friends with the appellant.

Joshua Darnell testified that he had been incarcerated with the appellant and the victim in February 2002. During their incarceration, the victim offered one hundred dollars to the first inmate to inflict physical harm on the appellant. The victim made the offer because of a prior altercation between himself and the appellant. The victim believed that the appellant was involved in his incarceration. Darnell recalled that when the victim spoke with the appellant, he acted as if he and the appellant were friends; however, behind the appellant's back, the victim behaved as if they were enemies.

Scott Edward Fain testified that he had known the appellant for years and had met the victim a few times. Fain recalled that in the fall of 2001, he gave the victim a ride to the victim's father's

house. The victim, who had been drinking, retrieved a small blue steel pistol from his father's house and shot it once or twice.

Mark York testified that he had been incarcerated with the victim and the appellant in February 2002. During their mutual incarceration, the victim told York that he was in jail because the appellant was a "snitch" and had caused him to be there. The victim also told him that the appellant was going to pay when he got out of jail.

The thirty-eight-year-old appellant testified that he and the victim had been childhood friends, and they became reacquainted as adults when the appellant was released from prison. The appellant recalled that on February 1, 2002, the victim came to his trailer with a guitar. They drank beer, and the appellant gave the victim some of his Clonapin pills. They later went to Booher's house, with the victim taking his guitar. After they had been there for a while, Booher said she was not feeling well, and they decided to leave. The appellant went outside while the victim remained behind to use the bathroom. After seeing two police cars, the appellant decided to walk home, thinking the victim would soon follow. Shortly after the appellant arrived home, Diamond Booher called, saying that the victim came out of the bathroom, jumped on top of them in the bed, and was "messing with" her mother. The appellant asked Diamond to put the victim on the telephone. When the victim answered the telephone, the appellant asked him to leave Booher's house and come back to his house. The victim responded with a derogatory remark, telling the appellant that he would do what he wanted. The victim hung up on the appellant. The appellant spoke with Diamond again and asked for her address. Out of concern, the appellant called 911 and told the operator that the victim had an outstanding child support warrant. After the call, police arrested the victim and took him to jail.

On February 11, 2002, the appellant began serving jail time for a DUI sentence. The appellant was incarcerated with the victim. While they were in jail together, the appellant asked the victim why he did not come back to his trailer that night. The victim responded that he had wanted to stay at Booher's house. The victim then asked the appellant how police knew to arrive at Booher's house. The appellant told the victim that he called 911 because the victim was scaring Booher's children. The victim looked at the appellant with an expression of disbelief and betrayal. Thereafter, their friendship, while still intact, began to cool.

The appellant was released from jail on March 29, 2002. The victim had been released before him. After his release, the appellant put the victim's guitar in his lawn building and called the victim several times to tell him that he had his guitar; however, the victim did not return any of his calls.

The appellant next saw the victim on Saturday, April 20, 2002. That morning, the appellant, who did not eat breakfast, took one Depakote pill, a couple of Clonapin pills, and three Xanax pills. Additionally, he drank three six-packs of beer and smoked some marijuana. At noon, Booher called to invite the appellant to lunch. While at Booher's house, the appellant ate and consumed more beer. The appellant returned home between 4:00 and 4:30 p.m. to wait for Mark Gentry, who was taking

him to work on the Gentrys' trailer. While waiting on the Gentrys, the appellant drank three or four more beers and took five Xanax pills. When Mrs. Gentry picked him up, the appellant took a bottle of Xanax pills and some marijuana with him. The appellant was wearing a white T-shirt, blue jean shorts, white socks, and tennis shoes. On the way to the Gentrys' trailer, they stopped at a convenience store where the appellant bought a six-pack of beer.

While at the Gentrys' trailer, the appellant continued to drink beer. At one point, he cut his leg, and he took eight Xanax pills for the pain. When he was ready to leave, the Gentrys drove the appellant home. En route, at approximately 9:30 pm. or 10:00 pm., he asked Mr. Gentry to take him to the victim's camper. The appellant said he had the victim's daughter's guitar and wanted to give it back to the victim, and he wanted to give the victim his new telephone number. The appellant gave Mr. Gentry directions to the victim's camper, but they did not take his usual route because the alcohol and pills were beginning to impair his judgment. The appellant stated that he was not armed, explaining that he had no intent to kill the victim when he went to the victim's camper.

When they arrived at the victim's camper, the appellant told Mr. Gentry to let him out then park at the nearby church to wait for him. The appellant knocked on the victim's door, and the door suddenly burst open with the plexiglass window shattering in the appellant's face. The victim came out of his camper, armed with a gun, and began calling the appellant a "snitch" and other derogatory names. The victim swung the gun, hitting the appellant's right wrist, causing his wrist to bleed. The appellant bent, searching for a weapon to knock the gun out of the victim's hand. The appellant found a stick and came up swinging. The appellant missed the gun but hit the victim in the shoulder or the head. The appellant asserted that the victim was not dissuaded from trying to hurt him. The appellant claimed that he was so frightened that he began to lose consciousness; however, he kept swinging the stick, trying to get the victim to leave him alone. The next thing the appellant remembered was the victim lying on the ground. The appellant believed that he was unconscious. At that point, the appellant began "coming to." The appellant stated that during the incident, he was "scared . . . plumb to death."

The appellant saw the gun next to the victim, and he picked it up. He said he did not know if the gun was loaded because he did not check it. The appellant walked toward the Gentrys' van. On the way, he took his shirt off, wrapped the gun in his shirt, and stuck it in his pants. He threw the stick in the woods nearby. When he got into the Gentrys' van, he told them that he and the victim had gotten into a scuffle. He could not recall the route they drove on the way back because he was so shaken from the altercation. He also did not recall stopping at a store in Johnson City or calling his sister.

The appellant said that he was heavily intoxicated when he arrived at his sister's house. He woke the next morning on the floor of his niece's bedroom and found the room in complete disarray. He did not know what had happened to his clothes and could not find them. Later that morning, his brother-in-law drove him home.

On April 22, 2002, the victim's brother, Billy, called the appellant and informed him that the victim was dead. The appellant was upset by the news. At some point that day, the appellant gave a statement at the sheriff's department, but he did not tell the detectives that he had seen the victim on April 20. In fact, he lied and told police that he was with someone named Amy on the night of April 20. He acknowledged making several telephone calls to the Gentrys on April 22. On April 23, the appellant went to Booher's house. The Gentrys arrived at Booher's residence, and the appellant talked to them about what had happened the night of the murder.

The appellant said he was arrested at approximately 4:00 p.m. or 5:00 p.m. on April 24, 2002, at Booher's house. Just prior to his arrest, the appellant took over 20 Lortab pills, and he drank a little over twelve beers. Police took the appellant to the sheriff's department for questioning. Detective Christian told the appellant that he needed to advise the appellant of his <u>Miranda</u> rights, then he began reading something very fast. The appellant testified that he did not know what his <u>Miranda</u> rights were. Regardless, the appellant signed a waiver of rights form and voluntarily spoke with Detective Christian. During the interview, the appellant admitted to Detective Christian that he saw the victim the night of the murder. He told the detectives that he had heard that the victim's brother, Billy, had raped Booher, and he thought the victim had tried to do the same thing. He related to police that when he arrived at the victim's camper on the night of the murder, the victim attacked him with a gun. The appellant explained to police that he used a stick to defend himself. The appellant testified that the detective read his statement to him but said he read it so fast that he could not understand him. Regardless, the appellant signed his statement, believing that Detective Christian had written everything that the appellant had told him.

On cross-examination, the appellant said that he and the victim had fought before, but the victim had never been seriously injured. The appellant acknowledged that he told Detective Christian he did not own a gun; however, he had taken a gun from a man who had borrowed money from him, and the man never returned for the gun. He said he tied the gun in a sock and took it to Eve Griffin's house. The appellant maintained that if he told Garrett that he killed the victim because he was bored, he only made the remark sarcastically because he and Garrett were arguing. He remembered calling his ex-wife, Regina Hawkins, on the day he was arrested, acknowledging that he told her that no one was going to call him a "snitch."

Based upon the foregoing evidence, the appellant was convicted of first degree premeditated murder, and he received a sentence of life imprisonment. On appeal, the appellant raises the following issues for our review:

> (1) whether the trial court erred in refusing to admit into evidence tape recordings of telephone calls which the victim made in February 2002;
>
> (2) whether the trial court erred in refusing to allow the appellant to cross-examine Mrs. Gentry regarding a statement her husband made in her presence to police;

(3) whether the trial court erred in ordering the appellant to disclose information regarding the appellant's mental evaluation;

(4) whether the trial court erred in denying the appellant's motion for a pretrial subpoena duces tecum for the victim's medical records;

(5) whether the trial court erred in failing to instruct the jury that the State had a duty to preserve evidence;

(6) whether the trial court erred in finding Tennessee Code Annotated section 40-18-110 (2003) was constitutional; and

(7) whether the evidence was sufficient to sustain the appellant's conviction.

We will address these issues in an order different from that in which they were raised.

## II. Analysis

### A. Sufficiency of the Evidence

On appeal, the appellant argues that the evidence is insufficient to support his conviction for premeditated first degree murder, saying that "the evidence of premeditation . . . is entirely circumstantial and does not exclude the reasonable theory the intent to kill was formed during an altercation that was not planned in advance."

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The appellant was convicted of premeditated first degree murder, which is defined as "the premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1) (2003).

Tennessee Code Annotated section 39-13-202(d) defines "premeditation" as "an act done after the exercise of reflection and judgment."

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id.

The element of premeditation is a question of fact for the jury. State v. Davidson, 121 S.W.3d 600, 614 (Tenn. 2003). Although the jury may not engage in speculation, it may infer premeditation from the manner and circumstances surrounding the killing. State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Our supreme court has delineated several circumstances from which a jury may infer premeditation, including, but not limited to, declarations of the intent to kill, evidence of the procurement of a weapon, the use of a deadly weapon upon an unarmed victim, the particular cruelty of the killing, preparations before the killing for the purpose of concealing the crime, and calmness immediately after the killing. Id.

Viewed in the light most favorable to the State, the evidence at trial established that the appellant had the Gentrys drive him to the victim's camper on the night of April 20, 2002, and told them to wait for him at a nearby church. The appellant returned to the Gentrys' van a short time later with blood on his face, saying that he had left the victim "for dead and that it was gruesome as hell." Detectives recovered from the woods near the victim's camper a fifty-two-inch hewn tree limb. The limb bore blood, hair, and brain matter. The blood was identified as being the victim's. Dr. Stephens testified that the victim died as a result of blunt trauma to the head and had sustained numerous blows to the head and upper torso, wounds which were consistent with being repeatedly struck by the tree limb. Dr. Stephens noted that some of the blows came when the victim had his back turned from his attacker and some of the blows occurred while the victim was braced against a wall "or even more likely on the ground." Moreover, there was evidence that the appellant was upset with the victim for assaulting Booher, and he was angry that the victim called him a "snitch." Further, the appellant told his sister, Garrett, that he killed the victim because he was bored. We conclude that from the foregoing evidence the jury could have reasonably determined that the appellant committed the first degree premeditated murder of the victim.

## B. Admissibility of Evidence

The appellant raises two issues relating to the admissibility of evidence. First, the appellant argues that the trial court should have allowed him to introduce telephone calls which were made by the victim during his February 2002 incarceration. Second, the appellant contends that the trial

court should have allowed him to cross-examine Mrs. Gentry regarding statements her husband made to police while she was present.

### 1. Telephone Calls

The appellant argues that the trial court erred in excluding the tape recordings of telephone calls made by the victim while he was incarcerated in February 2002. Specifically, he contends that these telephone calls were relevant to establish the victim's animosity toward the appellant and the victim's status as the aggressor.

"'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401; see also State v. Kennedy, 7 S.W.3d 58, 68 (Tenn. Crim. App. 1999). Tennessee Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible except as [otherwise] provided . . . . Evidence which is not relevant is not admissible." However, even relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Tenn. R. Evid. 403.

The appellant sought to introduce tape recordings of nine telephone calls the victim made to his sister in February 2002 while he was incarcerated in the Sullivan County Jail. In the first telephone call made on February 4, 2002, the victim asked his sister to take care of his dog and asked about posting his bond. The victim made a vague reference to the appellant being at Booher's residence shortly prior to his arrest. The victim called his sister again later that day but did not mention the appellant.

On February 8, 2002, during the third conversation with his sister, the victim again asked his sister about his dog and his bond. The victim mentioned that the appellant would be incarcerated on February 11. On February 10, 2002, the victim told his sister that the appellant would be at the jail the following day. The victim said that he did not know if he wanted to be incarcerated with the appellant.

On February 13, 2002, the victim called his sister. He asked about his bond but did not mention the appellant. He called her later that same day and asked her to borrow money to post his bond. He mentioned that the appellant had given him a bail bondsman's card and had said that "Sugar Mama" could get him out of jail for fifty dollars. The victim told his sister that the appellant was in the jail down the hall from him. The victim called his sister a third time on February 13, again asking about his bond. He said he had sent a note to the appellant asking to borrow money for his bond. The appellant did not respond to the query. The victim told his sister that he needed to get his guitar from Booher's house. The victim said that the appellant had to serve fifty days in jail. The victim opined that he believed that the appellant had him thrown in jail with him so he would not be the only person in jail.

The victim next called his sister on February 14, 2002, and he told her that he had not been able to get the appellant to respond to his request for money. The victim again expressed his dissatisfaction of not having his bond posted, saying, "These mother fuckers are in here laughing at me. I'm on a two hundred and fifty dollars [bond], I ought to have been out of here, God damn. Cock suckin' Willie [the appellant] down there, man, I ain't, fuck with him no more, man, ever. I'm writin' him off." He later said, "I don't want to cause no problems for nobody, but God damn I'd just like to get out of here and take care of this shit. Like I said[,] it wasn't like I got drunk, public intoxicated drunk. You know (unintelligible). He done it his stupid self. Willie [the appellant] done this shit to me, just like he stuck me up to Bristol." In his last telephone call to his sister on February 15, 2002, the victim yet again asked about the money for his bond but did not mention the appellant.

The State objected to the introduction of the calls, saying that the telephone conversations were hearsay and irrelevant since they were made almost three months before the murder occurred. After reviewing the transcript of the taped telephone calls, the trial court ruled that the calls were inadmissible. The court found that most of the conversations revolved around the victim's dog, the guitar, and his bond. Specifically, the trial court stated:

> [E]very phone call was made to his sister. . . . Every phone call dealt with his wanting to get out of jail before he had his hearing. Most of the phone calls showed that he loved his dog. . . . He's got a second concern, his daughter's birthday or something is coming up and he really wants to get the guitar from this April Jackson [Booher] to take to, get it to go to his daughter, and it shows he wants to get his things in order . . . . And he actually says in there he didn't care about going to jail as a result of the hearing as long as he could just get out on bond for a few days to get a few things taken care of.

The court said that it would not waste the jury's time by having them listen to the conversations, finding, "I don't think it really goes to any animosity toward [the appellant.]" The court acknowledged that some of the calls reflected the victim's displeasure with the victim in February; however, there was nothing to indicate that the victim was still upset in April. Moreover, the victim never threatened the appellant; he merely stated that he was "writing him off." The court concluded by stating that the calls were not relevant, or, if relevant, listening to all of the calls would be a waste of the jury's time.

Later in the trial, the court revisited its ruling on the inadmissibility of the telephone calls, saying:

> And I want to say a bit more on the tapes that I sustained an objection to. I thought about it over the weekend, reviewed the transcript again this morning, and I still find that the Court feels that I could not allow the introduction of the derogatory remark made towards [the appellant] without allow[ing] the jury to hear all of the tapes. And

-16-

then if they heard all of the tapes, any probative value that, any remarks that [the victim] made against [the appellant] would be substantially outweighed by the prejudice to the State. First of all, I don't find that any of the remarks are probative of his threatening [the appellant] in any way or having any long term feelings of ill will towards [the appellant] are anymore to anybody else who didn't help him get out of jail on bond, but if there is any probative value[,] it's slight and it's outweighed by the prejudicial [e]ffect that it would have on, in this case against the State, so there.

The appellant argues that the trial court severely hampered his case in excluding the playing of the audiotapes, maintaining that the trial court "effectively gutted the defense's case" by excluding the calls. The appellant contends that without the calls themselves to demonstrate that the victim was unhappy with the appellant, the appellant had to rely upon the testimony of third persons and his own testimony to convey the victim's displeasure.

The appellant cites several cases in support of his claim that the trial court erred in its ruling as to the telephone conversations. In Neil P. Cohen et al., Tennessee Law of Evidence, § 4.04[5][d] (4th ed. 2000 & Supp. 2004), the law in Tennessee regarding the admissibility of prior threats of a victim against an appellant is explained:

> [if] the victim threatened the defendant, who then raises self-defense in trial [and] if the defendant was aware of the threat, the threat is admissible on the issue of whether the defendant had the apprehension of imminent bodily injury. If the defendant were not aware of the threat or the victim's violent character, the threat may still be admissible under another line of Tennessee cases.

For example, in State v. Saylor, 117 S.W.3d 239, 242 (Tenn. 2003), the proof adduced at trial revealed that during the afternoon of a day of drinking with others, Saylor struck the victim with a hatchet or hammer, killing him. Our supreme court concluded that the trial court had erred in not allowing testimony by one of the drinking companions that at 1:55 p.m. on the afternoon he was killed, the victim had said he was "going to kill" Saylor, regardless of the fact that Saylor had not been told of this threat. Id. at 247. The court explained that the testimony should have been admitted because

> "[t]he character of the deceased for violence, as well as [his] animosity toward the defendant, as indicated by words and actions at the time of the killing and before, are proper matters for consideration of the jury upon the question of self-defense. In some cases where self-defense is an issue, uncommunicated threats made by a deceased against a defendant are admissible as going to the state of mind of the deceased. However, the applicability of this rule is limited and it

-17-

> becomes operative only where relevant to explain the conduct of the
> deceased in establishing who was the aggressor."

Id. at 248 (quoting State v. Butler, 626 S.W.2d 6, 11 (Tenn. 1981)). The Saylor court went on to say:

> We think that Butler controls the issue in the case before us.
> Ruthie Hall's testimony consisted of an uncommunicated threat made
> by the victim, John Case, towards Saylor prior to the victim's death.
> Under Butler, such testimony is admissible as an exception to the rule
> excluding hearsay statements as an indication of the victim's state of
> mind, and it is relevant to establish the victim's status as the
> aggressor. [Butler], 626 S.W.2d at 11.

Id.

We conclude that Saylor is distinguishable from the instant case. First, we note that the threat to kill Saylor was made by the victim shortly before his death. In the instant case, the victim's comments came from nine telephone calls from the victim to his sister, beginning on February 4 and ending on February 15, 2002. The victim was killed on April 21, 2002. In four of the telephone calls, including the final one, which lasted ten minutes, the appellant was not mentioned. Further, there were only a few references to the appellant during the approximately eighty minutes of telephone conversations. The victim's conversations to his sister, consisted of comments such as he did not know if he wanted to be "locked up" with the appellant; he "ain't even heard from [the appellant]" who "evidently . . . just ain't gonna help [him]"; "Cock suckin' Willie . . . I ain't, fuck with him no more, man, ever. I'm writin' him off"; and "Willie done this shit to me, just like he stuck me up to Bristol." The victim's remarks about the appellant did not amount to threats of violence, instead consisting of comments that he was upset that the appellant had him thrown in jail, he did not know if he wanted to be incarcerated with the appellant, and he wanted nothing more to do with the appellant. In their entirety, the calls appear to consist mostly of complaints by the victim about his situation and his asking for news of relatives and his home. In fact, as the trial court noted in excluding the tapes, "[m]ost of the phone calls showed that he loved his dog." Thus, taking the statements of the victim in context, we conclude that the trial court did not abuse its discretion in excluding the tapes. We note that, as the appellant himself concedes, proof of the victim's displeasure with the appellant was introduced through other witnesses. Therefore, even if the trial court erred in excluding the calls, such error was harmless. See Tenn. R. Crim. P. 52(a); Tenn. R. App. P. 36(b).

### 2. Statement by Witness's Husband

The appellant next argues that the trial court erred in not allowing Chasity Gentry to be cross-examined about her husband's statement to the police, which statement was made in her presence. Mrs. Gentry testified that, on their way home from the victim's residence, they stopped at a gas station in Johnson City where she saw the appellant throw something in a dumpster and cover it up.

In his statement to the police on April 22, 2002, Mr. Gentry said that they did not stop anywhere after they left the camper, taking the appellant directly to his sister's house. Mr. Gentry did not testify at trial. Therefore, during the cross-examination of Chasity Gentry, the appellant sought to question her as to her husband's April 22, 2002, statement, saying: "And you sat there and listened as he told the police about it and your husband said that."

The State objected and argued that Mrs. Gentry could not testify as to what Mr. Gentry said because such testimony would be hearsay. The appellant responded that Mrs. Gentry had adopted the April 22 statement by signing it as a witness. The trial court disagreed, stating that "she witnessed the statement, it doesn't mean she agreed it was true." The appellant further argued that he was not attempting to introduce the statement to prove the truth of the matter asserted; instead, he wanted "[t]o prove that they said inconsistent things. I don't know which of those statements is true. I don't know if her second statement is true or her first statement is true, I just know it's inconsistent and she was present when it was said . . . ." The trial court sustained the State's objection.

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Generally, hearsay statements are inadmissible unless they fall under one of the recognized exceptions to the hearsay rule. Tenn. R. Evid. 802.

On appeal, the appellant argues that the contrasting April 22 and May 1, 2002, statements of Mark Gentry are "exculpatory" because in the first statement Mr. Gentry said that they did not stop anywhere and failed to include information about the stop at the convenience store between the victim's camper and the appellant's sister's house. Therefore, the statements should have been brought before the jury through the testimony of Mrs. Gentry. However, we note that this information was provided to the jury during Detective Christian's testimony. Specifically, on cross-examination, the following colloquy occurred:

> The appellant: Detective Christian, you said you went to that dumpster at the BP Station or someone did?
>
> Detective Christian: Someone did.
>
> The appellant: And what day did they go there?
>
> Detective Christian: May 1st.
>
> The appellant: May the 1st. Did anybody go to that dumpster at the BP Station before May the 1st?
>
> Detective Christian: No.

The appellant: On April the 22nd did anybody go to that BP Station?

Detective Christian: No, no one knew to go there till May 1st.

The appellant: On April 22nd, you took a statement from Mark Gentry, did you not?

Detective Christian: I did.

The appellant: And present and signing as a witness when that statement was made was Chastity Gentry, right?

Detective Christian: She was, she was there.

The appellant: Okay, you interviewed Mark Gentry again on April the 23rd, is that right?

Detective Christian: I did.

The appellant: And did anybody on April the 23rd go look at that dumpster?

Detective Christian: No, we didn't know anything about the dumpster till then.

The appellant: All right, and you interviewed Mark Gentry again on April the 24th?

Detective Christian: I did.

The appellant: And did anybody go check the dumpster on April the 24th?

Detective Christian: No.

The appellant: No one looked at the dumpster until May the 1st?

Detective Christian: Not until May 1st.

The appellant: And that was the first time you had any information about the dumpster?

-20-

> Detective Christian: That's the first time I'd received any information about the dumpster.
>
> The appellant: So no one at the sheriff's department had looked in that dumpster where the Gentry's [sic] say there were things thrown away until May the 1st?
>
> Detective Christian: Until May the 1st that's when we obtained the information about it.

Thus, because the appellant was able to elicit the desired testimony from a later witness, the court's error, if any, was harmless.

## C. Disclosure of Appellant's Mental Evaluation

The appellant contends that the trial court erred in ordering the disclosure of information regarding his mental evaluation. Prior to trial, the appellant filed notice pursuant to Tennessee Rule of Criminal Procedure 12.2 that he intended to present expert testimony as to a mental condition of the appellant which would relate to the issue of guilt. The State filed a response asking for the name and qualifications of the proposed expert and also requested a summary of the expert's testimony. The appellant responded that the State was not entitled to this information because he had not sought reciprocal discovery pursuant to Tennessee Rule of Criminal Procedure 16 and that Rule 12.2 does not require such disclosure. Following a hearing on the matter, the trial court concluded that if evidence was to be presented as to the mental condition of the appellant, the appellant should provide the State with the name, address, and qualifications of the expert witness, as well as a copy of the expert's report. The appellant argues that the trial court erred in this ruling. The State disagrees, noting that no expert testimony was presented at trial as to the appellant's mental condition.

It is unnecessary for us to determine whether the trial court erred in its interpretation of Rules 12.2 and 16, as well as their interplay. The appellant does not allege or attempt to show how this ruling had any effect on the trial. Accordingly, we conclude that even if the court erred in this ruling, the error was harmless.

## D. Pretrial Subpoena of Victim's Medical Records

The appellant argues that the trial court erred in denying his motion for a pretrial subpoena duces tecum of the victim's medical records. Prior to the trial, the appellant's counsel sought to have subpoenas issued to all hospitals in Washington and Sullivan Counties, seeking medical records of the victim contending that the records were necessary to learn of his prior violent behavior. Following a hearing, the court declined to issue the subpoenas requested but agreed to issue one for a 1998 incident, of which the defense was aware, involving the victim. At a later hearing, after the State advised it had obtained certain of the victim's medical records, the State agreed to provide the defense with records that might be exculpatory and furnished medical records as to three times the

victim had received medical treatment. Relying on the holding in Pennsylvania v. Ritchie, 480 U.S. 39, 107 S. Ct. 989 (1987), the appellant argues that the court erred in not allowing subpoenas to be served to all hospitals in the two-county area.

The defendant in Ritchie had been charged with various sexual offenses against his minor daughter, and he sought to obtain confidential records from Children and Youth Services, a state agency, as to its records on the pending charges as well as earlier complaints of abuse. The Supreme Court ruled that defense counsel was not entitled to examine the records but that the trial court should make an *in camera* inspection of them to ascertain which were relevant and should be supplied to the defense. Id. at 61, 107 S. Ct. at 1003. By contrast, in the instant case, the appellant argues that his conviction should be reversed because the trial court did not allow him to seek records which may or may not exist. We note that at trial the appellant did not utilize the medical records he had received as to three incidents involving the victim. We disagree with the appellant's contention that the holding in Ritchie provides authority for the appellant to receive these records.

### F.  Instruction on State's Duty to Preserve Evidence

The appellant argues that the trial court erred in failing to instruct the jury as to the State's duty to preserve evidence. He contends that the "Styrofoam, plexi-glass, and duct tape from the [victim's] camper door was evidence 'that could [have been] favorable to the [appellant].'" During a jury-out hearing, Eddie Simms, an investigator with the Sullivan County Public Defender's office, testified that Detective Christian told him that the victim's camper had been destroyed. During questioning by the trial court, Simms said he had visited the crime scene "right around the time of the preliminary hearing," but the camper was no longer there.

Detective Christian was recalled and testified that he told Simms the victim's camper "had been destroyed or moved because [he] didn't know for sure." He said that "sometime later on down the road" he learned that the camper still existed, but no one ever made any further requests or asked him anything else about the camper. He acknowledged that he never told Simms that the camper was still in existence.

Initially, we note that the Due Process Clause of the Fourteenth Amendment to the United States Constitution and Article I, Section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. See Johnson v. State, 38 S.W.3d 52, 55 (Tenn. 2001). As such, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to the petitioner's guilt or innocence or to the potential punishment faced by a defendant. See Brady v. Maryland, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196-97 (1963).

In State v. Ferguson, 2 S.W.3d 912 (Tenn. 1999), our supreme court addressed the issue of when a defendant is entitled to relief when the State has lost or destroyed evidence that was alleged to have been exculpatory. The court explained that a reviewing court must first determine whether the State had a duty to preserve the lost or destroyed evidence. Ferguson, 2 S.W.3d at 917.

Ordinarily, "the State has a duty to preserve all evidence subject to discovery and inspection under Tenn. R. Crim. P. 16, or other applicable law." Id. However,

> "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Ferguson, 2 S.W.3d at 917 (quoting California v. Trombetta, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2534 (1984) (footnote and citation omitted)).

If the proof demonstrates the existence of a duty to preserve the evidence and further shows that the State has failed in that duty, a court must proceed with a balancing analysis involving consideration of the following factors:

> 1. The degree of negligence involved;

> 2. The significance of the destroyed evidence, considered in light of the probative value and reliability of secondary or substitute evidence that remains available; and

> 3. The sufficiency of the other evidence used at trial to support the conviction.

Id. (footnote omitted). If the court's consideration of these factors reveals that a trial without the missing evidence would lack fundamental fairness, the court may consider several options. For example, the court may dismiss the charges or, alternatively, provide an appropriate jury instruction. Id.

Generally, a trial court's decision to admit or exclude evidence at trial will not be overturned absent an abuse of discretion. State v. James, 81 S.W.3d 751, 760 (Tenn. 2002); see also State v. William C. Tomlin, Jr., No. M2003-01746-CCA-R3-CD, 2004 WL 626704, at *3 (Tenn. Crim. App. at Nashville, Mar. 30, 2004), perm. to appeal denied, (Tenn. 2004). Further, "[t]he decision whether to dismiss an indictment lies within the discretion of the trial court." State v. Harris, 33 S.W.3d 767, 769 (Tenn. 2000). An abuse of discretion exists when the "'court applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining.'" State v. Shirley, 6 S.W.3d 243, 247 (Tenn. 1999) (quoting State v. Shuck, 953 S.W.2d 662, 669 (Tenn. 1997)).

First, we must determine whether the State had the duty to preserve the contested items of evidence. It seems clear that the items were at least valuable to the preparation of the appellant's defense. As such, the State was required to preserve the items. Next, we must determine the consequences of the State's failure to adhere to that duty.

The record demonstrates that the evidence was lost through simple negligence. Moreover, the appellant has not explained why the photographs were not as useful as the Styrofoam, plexiglass, and duct tape from the victim's front door would have been. In fact, the appellant utilized the photographs of the victim's residence at length in his closing and argued at length regarding his client's actions at the scene:

> Now, we know [the appellant] walks to the trailer and we know there's no evidence of a fight inside that camper. There's no blood inside the camper and the inside is not turned upside down like it would have been if you had two large men like that fighting in that small an area. There's no, no indication of any kind of scuffle in there. Now, the damage to the trailer starts at the door. That door is an important piece of evidence. You've heard that this window frame had plexi-glass in the top frame, Styrofoam in the bottom frame. It was held together by Duck [sic] tape on both sides. There was Duck [sic] tape on the outside, there was Duck [sic] tape on the inside. You can see the Duck [sic] tape attached to the Styrofoam and plexi-glass. You can see where it was. Look at that outside door. All of the Duck [sic] tape on the outside is gone except for a little bitty strip along the bottom. It's all gone. Now the inside of the door looks differently. The inside of the door, and here's a close up of it, there you go, you can see the tape on the inside. You can see the gray Duck [sic] tape on the inside is largely undisturbed. It goes all the way up the side and it goes down the bottom. It's hidden some by that curtain, but it's intact on the inside. Now, what does that tell you, that's all broken out. Well, the only way you can explain that is you have a situation like this, you have Duck [sic] tape on both sides holding two things. After an event occurs what's left is the inside tape. The covering and the outside tape is all gone. What does that tell you? The only logical explanation is the force came from the inside. If the force pushing on those things came from the other side the tape on the inside would be dislodge[d] and the tape on the outside would be there, but it's just the opposite, folks. Just the opposite. How else can you explain how that got broken out[?] In [the appellant's] statement he tells – they didn't put it in the statement he signed by the way, you notice – but he, they mentioned he said he came busting out of that door. There's the proof of that.

The appellant has not specified what evidentiary value the specific items would have offered that the photographs did not. Moreover, there was ample evidence at trial supporting the appellant's conviction. The trial court concluded that these items would have added little, if anything, to the defense in this matter, and we agree. Accordingly, we conclude that the trial court did not err in refusing to give the proposed instruction.

### F.  Constitutionality of Lesser-Included Offense Statute

Lastly, the appellant argues that the trial court erred in denying his motion to declare Tennessee Code Annotated section 40-18-110 (2003) unconstitutional, citing State v. Robert Page, No. W2003-01342-CCA-R3-CD, 2004 WL 3352994 (Tenn. Crim. App. at Jackson, Aug. 26, 2004), perm. to appeal granted, (Tenn. 2005). However, the appellant makes no claims that the trial court erred in its charging lesser-included offenses. Rather, it appears that he is seeking an advisory opinion as to a statute which he does not claim affected his trial. We decline to provide such an opinion.

### III.  Conclusion

Based upon the foregoing authorities and reasoning, we affirm the judgment of the trial court but remand for entry of a corrected judgment to reflect the date of the judgment as March 9, 2004, rather than March 9, 2002.

_____
NORMA McGEE OGLE, JUDGE